## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

IN RE:

**U-HAUL CO. OF WEST VIRGINIA**                    **Case No.: 21-bk-20140**
                                                   **Chapter 11**
        **Debtor.**

### OMNIBUS DECLARATION OF CHARLES HERTZLER IN SUPPORT OF
### CHAPTER 11 PETITION AND DEBTOR'S FIRST DAY MOTIONS

I, Charles Hertzler, declare as follows under penalty of perjury under the laws of the United States of America:

1.      On June 16, 2021 (the "**Petition Date**"), U-Haul Co. of West Virginia ("**UHWV**" or "**Debtor**") filed a voluntary petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "**Bankruptcy Code**") initiating the above-captioned chapter 11 case (the "**Bankruptcy Case**") in the United States Bankruptcy Court for the Southern District of West Virginia (the "**Court**").

2.      I am a member of the Board of Directors of the Debtor and was appointed by the Board of Directors to serve as the Responsible Person for the Debtor in its chapter 11 case. I have over thirty-seven (37) years of experience working in the U-Haul system. I am an employee of U-Haul Business Consultants, but function as an Executive Vice President for field operations. My responsibilities include management and oversight of all U-Haul rental companies on the East Coast from Maine south through parts of North Carolina. I am familiar with the Debtor's day-to-day operations, business affairs, and books and records. I have been duly authorized by the Debtor's Board of Directors to provide this declaration in support of the Debtor's chapter 11 petition and first day motions filed concurrently herewith.

3.      To enable the Debtor to operate more effectively and mitigate the adverse effects

1

of its chapter 11 filing, various types of relief are requested in "first day" motions filed with the

Court along with this declaration.  I submit this declaration in support of the first day motions

and the voluntary petition filed by the Debtor.  Except as otherwise indicated, all facts set forth

in this declaration are based upon my personal knowledge, my review of the relevant documents,

or my opinions based on my experience and knowledge of the operations and financial condition

of the Debtor.  If called to testify in this matter, I can and will testify competently to the facts set

forth herein.

### Background and Business Operations

4.     The Debtor was incorporated in the State of West Virginia in 1970 and has

operated continuously in the State since that date.  U-Haul International, Inc. ("**UHI**") is the sole

shareholder of the Debtor.  The Debtor's corporate headquarters is located at 6114 MacCorkle

Avenue, Saint Albans, West Virginia, 25177.  The Debtor operates under the direction of a three

(3) member Board of Directors.

5.     The Debtor operates as part of a national system of do-it-yourself one-way and

local equipment rentals and self-storage facilities under the U-Haul brand.  The Debtor is an

independent management, marketing and merchandising company that operates twelve (12) U-

Haul rentals centers throughout the State of West Virginia and contracts with one hundred

twenty-three (123) independent U-Haul dealers.  Ten of the twelve rental centers also have self-

storage facilities.

6.     The Debtor operates under an Amended and Restated U-Haul Rental Company

Contract with UHI (the "**Rental Company Contract**").  The rental equipment and self-storage

facilities operated by the Debtor are owned by affiliates of UHI.  Under its contract with UHI,

among other things, the Debtor is responsible for the management and operation of all rental and

self-storage centers, and the merchandising and supervision of the maintenance and repair of all U-Haul rental equipment in its territory.  The Debtor's territory includes West Virginia and small portions of Virginia, Kentucky and Ohio.

7.     Under the terms of the Rental Company Contract, UHI provides various system-wide services to the Debtor, including complete accounting, cash management, payroll and benefits, procurement, inventory balancing, fleet management and insurance programs.

8.     The Debtor currently employs 107 employees in West Virginia; engages with numerous local and regional vendors for supplies, materials and other goods necessary for its operations; occupies office, self-storage and equipment rental locations, and contracts with independent dealers in the Debtor's territory who rent U-Haul equipment as a supplement to their primary business operations.

9.     The Debtor primarily markets to customers in West Virginia for U-Haul one-way and local rental equipment for do-it-yourself moving (trucks and trailers) and self-storage services.  The Debtor also sells moving and storage supplies, propane and related accessories together with supplemental services.

10.     The Debtor earns revenue for its management, marketing and merchandising services as follows:

        a.     <u>Equipment Rental</u>:  For its marketing and merchandising services on one-way and round-trip rental contracts from the Debtor's locations, the Debtor is paid a standard fee-based commission that averages approximately 20% of the gross rental receipts.

        b.     <u>Managed Self-Storage</u>:  For five of the ten self-storage facilities, the Debtor manages the facilities and is paid a standard fee-based commission, that varies by

3

location from 4-5% of the gross revenues, for its marketing and merchandising services, and the Debtor is reimbursed for all costs and expenses of the operations.

        c.    <u>Leased Self-Storage Locations.</u>  For the other five self-storage locations the Debtor leases directly from the owner of the facility and retains all self-storage revenue net of the rental/lease expense that flows to the property owner.

        d.    <u>Self-moving, Self-Storage Product, and Service Revenue</u>: The Debtor charges market-based prices at the point of sale for these retail products and services.

**<u>Financial Condition and Events Leading to Chapter 11</u>**

11.    For several years, the Debtor's business struggled from poor management and from a lack of sufficient rental centers, self-storage facilities and independent dealers.  The Debtor suffered annual operational losses of ($346,303), ($575,088), and ($382,800) for each of the three fiscal years ending March 31, 2021, 2020, and 2019, respectively.  The global pandemic hit just when I thought the Debtor's business would turn around.

12.    The Debtor operates on a March 31 fiscal year end accounting cycle.  For the fiscal year ended March 31, 2021, the Debtor had total revenues of $5,942,660 against expenses from operations of $6,288,963.  For the fiscal year ended March 31, 2020, the Debtor had total revenues of $5,184,614 against expenses from operations of $5,759,702.  For the fiscal year ended March 31, 2019, the Debtor had total revenues of $5,072,894 against expenses from operations of $5,455,694.

13.    As of March 31, 2021, 2020, and 2019, the Debtor had total assets of $1,223,932, $1,068,460, and $1,010,267, respectively, and had total liabilities (excluding related party liabilities) of $1,126,508, $793,143, and $544,198, respectively.

14.    The numbers above do not include the Debtor's single largest liability, an

obligation owed to UHI.  For years, the Debtor has struggled under the weight of a multi-million

liability owed to UHI and the accompanying interest expense.  Debtor reserves the right to

examine the amount of UHI's claim and therefore Debtor has listed the claim as "disputed" on its

schedules.  As of the Petition Date, UHI's claim on Debtor's books totaled $118,131,303.00.

Again, subject to the same reservation, the annual UHI claim amount and corresponding interest

expense for the past three fiscal years were as follows:

    a.      FYE March 31, 2021 - $118,108,258 with an annual interest expense of
$8,729,507;

    b.      FYE March 31, 2020 - $109,028,671 with an annual interest expense of
$8,010,594; and

    c.      FYE March 31, 2019 - $100,834,771 with an annual interest expense of
$7,371,112.

15.    The Debtor's potential liabilities also include disputed, contingent, and

unliquidated claims asserted by plaintiffs in two pending lawsuits.

16.    In *Evans, et al. v. Williams, et al.*, Civil Action No. 20-CI-00419, pending in the

Commonwealth of Kentucky, Boyd Circuit Court, the plaintiffs allege that the Debtor is liable

for damages caused when Maura Williams, driving a U-Haul truck rented from the Debtor,

collided with a motor vehicle being driven by Jason Smalley resulting in Mr. Smalley's death.

The plaintiffs contend that the Debtor is liable for negligence and strict liability.  There is no

specific allegation that the U-Haul truck malfunctioned.  The Debtor denies any liability in the

case.

17.    In *Ferrell, et al. v. U-Haul Co. of West Virginia*, Civil Action No. 11-C-1426

pending in the Circuit Court of Kanawha County, West Virginia, the three (3) named plaintiffs

allege that the Debtor improperly charged a $1, $3, or $5 environmental fee in truck rental transactions from March 2008 – May 2017.  In the case, which has been languishing in state court for ten (10) years, the court certified two classes of potential claimants that together total 323,746.  The total environmental fees collected by the Debtor from all potential claimants is $644,566.  However, on information and belief, in addition to any actual damages, the lawyers for the class plaintiffs are seeking penalty damages in the tens of millions of dollars against the Debtor under the West Virginia Consumer Credit and Protection Act, plus millions of dollars more in attorneys' fees. The Debtor denies any liability on the alleged claims but already has had to spend nearly a million dollars defending the claim.

18.     The professional fees and expenses incurred by the Debtor defending these lawsuits has further strained the Debtor's resources at the same time it is struggling to turn around its business operations.

19.     As of the Petition Date, the Debtor's statements and schedules reflect total assets of $1,129,200.00 and total liabilities of $495,024.00, excluding the UHI claim and the contingent, disputed and unliquidated litigation claims discussed above.

20.     The Debtor filed a chapter 11 case to obtain the breathing room and fresh start made available to troubled companies under the Bankruptcy Code.  The Debtor believes that restructuring the company through a chapter 11 reorganization is in the best interests of creditors, and is the best alternative to ensure that the Debtor will be able to continue to serve customers in the Debtor's territory as it has since 1970.  The filing will preserve jobs for 107 families in the State of West Virginia, the 123 dealers and their families, and will also preserve the Debtor's direct and indirect positive impact on the community in the State of West Virginia.  The Debtor currently is considering a number of potential restructuring options, including a sale of the assets

or equity of the debtor.

## First Day Motions

21.     In order to effectively administer its case and reorganize, the Debtor will need certain immediate relief from the Court, including: (a) authorization to retain counsel and a financial advisor, (b) authorization to maintain its existing cash management and accounting systems in the ordinary course of business, (c) authorization to pay pre-petition employee wages and benefits in the ordinary course of business, (d) authorization to honor dealer contracts and customer equipment rental and self-storage contracts in the ordinary course of business, (e) authorization to continue utility service and determine adequate assurance of future payments, and (f) authorization to establish a claims bar date and notice thereof.  Accordingly, with the filing of its voluntary petition, the Debtor has filed a number of motions and applications (the "**First Day Motions**") that are necessary to enable the Debtor to operate in chapter 11 with a minimum of disruption and loss of productivity.  The Debtor requests that each of the First Day Motions be granted on an interim and then a final basis as a critical element in achieving maximization of the value of the Debtor's estate.  A description of each of the First Day Motions is provided below.

### Applications to Employ Debtor's Professionals

### Application to Employ Bankruptcy Counsel for the Debtor

22.     By separate application, the Debtor seeks to employ and retain Flaherty Sensabaugh Bonasso PLLC ("**Flaherty**" or the "**Firm**") as counsel in this bankruptcy case and for all related matters, effective as of the Petition Date.  The Debtor seeks to retain Flaherty as its counsel because of the Firm's experience and expertise in the field of business reorganizations under chapter 11 of the Bankruptcy Code and its ability to respond quickly to the multitude of

7

legal issues that may arise in this case.  The Debtor believes that Flaherty is well-qualified to represent it in this case in an efficient and timely manner.

23.    Subject to Court approval under Section 330(a) of the Bankruptcy Code, compensation will be payable to Flaherty on an hourly basis, plus reimbursement of actual, necessary expenses and other charges incurred by the Firm.  The Debtor believes that the hourly rates charged by Flaherty are consistent with the rates charged in comparable non-bankruptcy matters and are subject to periodic adjustments to reflect economic and other conditions.

24.    Flaherty's hourly rates vary with the experience and seniority of the individuals assigned and may be adjusted by the Firm from time to time.  Flaherty's current customary hourly rates for the individual attorneys expected to participate in this case range from $235 to $350.  It is Flaherty's policy to charge its clients in all areas of practice for all expenses incurred in connection with a client's case.  The expenses routinely charged to clients include, among other things, photocopying, witness fees, travel expenses, filing and recording fees, long distance telephone calls, postage, express mail and messenger charges, computerized legal research charges and other computer services, expenses for working meals and telecopier charges.  The Firm will charge the Debtor for those expenses in a manner and at rates consistent with charges made generally to its other clients.

25.    The professional services that Flaherty will render to the Debtor may include, but shall not be limited to, the following:

        a.    providing legal advice with respect to the Debtor's powers and duties as debtor in possession in the continued operation of its business and management of its properties;

        b.    advise the Debtor with respect to its powers and duties as a debtor in possession in the continued management and operation of its business and properties;

    c.      attend meetings and negotiate with representatives of creditors and other parties-in-interest;

    d.      take actions to protect and preserve the Debtor's estate;

    e.      prepare on behalf of the Debtor all motions, applications, answers, orders, reports, and papers necessary to the administration of the estate;

    f.      negotiate and prepare on the Debtor's behalf any plan(s) of reorganization, disclosure statement(s), and all related agreements and/or documents, and take any necessary action on behalf of the Debtor to obtain confirmation of such plan(s);

    g.      represent the Debtor in connection with post-petition financing, if necessary;

    h.      advise the Debtor in connection with any potential sale of assets;

    i.      appear before this Court, any appellate courts, and the United States Trustee and protect the interests of the Debtor's estate before such courts and the United States Trustee;

    j.      consult with the Debtor regarding non-bankruptcy disciplines of law such as, by way of example only, tax, labor and employment, real estate, corporate finance, securities, and certain litigation matters; and

    k.      perform all other necessary legal services and provide all other necessary legal advice to the Debtor in connection with this Chapter 11 case.

26.     Except as set forth in the Declaration of James W. Lane, Jr. (the "**Lane Declaration**"), to the best of the Debtor's knowledge, Flaherty:   (a) does not have any connection with the Debtor, its affiliates, its creditors, the United States Trustee, any person employed in the Office of the United States Trustee, or any other party in interest, or its respective attorneys and accountants; (b) is a "disinterested person," as that term is defined in Section 101(14) of the Bankruptcy Code; and (c) does not hold or represent any interest adverse to the Debtor's estate.

27.     The Debtor, subject to the provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, Orders of this Court, and the Fee Guidelines, proposes to pay Flaherty its customary hourly rates in effect from time to time as set forth in the Lane Declaration and submits that such rates are reasonable.

28.     Prior to the Petition Date, Flaherty received retainers totaling $60,000 (the "**Flaherty Retainer**").   The Retainer was applied to invoices for services rendered in contemplation of this case and reimbursement of related costs and expenses incurred by Flaherty on behalf of UHWV.  After payment for pre-petition services, the balance of the Retainer held by Flaherty is $5,638.25.   The Retainer shall serve as security for the payment of unpaid post-petition fees and expenses owed to Flaherty by the Debtor, as may be further ordered by the Court in accordance with the Application.

### Application to Employ Financial Advisor for the Debtor

29.     The Debtor requests the entry of an order pursuant to Sections 327(a), 328 and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014 and 2016 and Local Rule 2014-1, authorizing them to employ and retain Brown Edwards & Company, L.L.P. ("**Brown Edwards**") effective as of the Petition Date as its financial advisor in relation to this chapter 11 case.  As set forth below, Brown Edwards is particularly well-suited to provide the type of services required by the Debtor, and the Debtor believes that they would be best served by engaging Brown Edwards as financial advisor.

30.     As set forth in the *Declaration Of Melisa Price In Support of Debtor's Application To Employ And Retain Brown Edwards & Company, L.L.P. As Financial Advisor Nunc Pro Tunc To The Petition Date* (the "**Price Declaration**"), Brown Edwards is a financial advisory services firm. Brown Edwards has substantial experience providing financial advisory

services for businesses, including analyzing business operations, financial budgeting and modeling, operational analyses, and business valuation services.

31.     The professionals who comprise Brown Edwards have a thorough understanding of the restructuring process and have substantial experience advising Debtor, creditors' committees, and other stakeholders in chapter 11 proceedings.

32.     Accordingly, Brown Edwards is well qualified and has the necessary background and relevant experience required to serve as financial advisor for the Debtor in its chapter 11 case.

33.     The employment of Brown Edwards is appropriate and necessary to enable the Debtor to execute faithfully its duties as debtor and debtor-in-possession.

34.     Brown Edwards has stated its desire and willingness to act in this case and to render the necessary professional services as financial advisor to the Debtor on a monthly retainer basis, which is consistent with Brown Edwards's current business practices.

35.     As set forth more fully in the Brown Edwards Engagement Letter and the Price Declaration, Brown Edwards will provide general restructuring advice and financial advisory services.

36.     Specifically, and as set forth in the Brown Edwards Engagement Letter, the Debtor has asked Brown Edwards to provide services including, but not limited to:

> a)     If requested by the Debtor, assisting with monthly operating reports, UST packages and other financial information and disclosures required during the pendency of the Chapter 11 case;
>
> b)     If requested by the Debtor, assisting the Debtor and legal counsel with preparation of all case motions requiring financial information or analysis;
>
> c)     If requested by the Debtor, assisting with the development of the DIP budget and monitoring of all cash disbursements according to the DIP budget;

d)     If requested by the Debtor, advising the Debtor and legal counsel regarding any valuation analysis of the Debtor's business or equity in the Debtor; and

e)     If requested by the Debtor, rendering such other general business consulting or such additional assistance as Debtor' management or counsel may deem necessary that are consistent with the role of a financial advisor and not duplicative of services provided by other professionals.

37.     The Debtor believes that the services to be provided by Brown Edwards will not be duplicative of the services provided by any other professional in the chapter 11 case. Moreover, the Debtor will use reasonable efforts to avoid the duplication of services being provided by Brown Edwards and other professionals and will coordinate such efforts to the extent reasonably feasible.

38.     In accordance with the terms of the Brown Edwards Engagement Letter, Brown Edwards will be paid by the Debtor for the services of the Brown Edwards professionals at their customary hourly billing rates, which shall be subject to the following ranges:

| Title | Hourly Fee |
| --- | --- |
| Partners | $425 |
| Directors | $390 |
| Managers | $185 |
| Senior | $160 |
| Associate | $125 |
| Administrative | $100 |

Such rates are subject to periodic (annual) adjustments in accordance with Brown Edwards's established billing practices and procedures.

39.     The Debtor will, upon request, reimburse Brown Edwards for its documented,

reasonable out-of-pocket expenses in connection with the services contemplated by the Brown Edwards Engagement Letter, including travel, lodging, duplicating, computer research, messenger services, and telephone charges.

40.     The Debtor understands that Brown Edwards intends to apply to the Court for the allowance of compensation for professional services rendered and reimbursement of expenses incurred in accordance with applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the terms of any order establishing procedures for interim compensation and reimbursement of expenses for professionals entered in the chapter 11 Case.

41.     The Debtor believes that Brown Edwards is a "disinterested person" as defined in § 101(4) of the Bankruptcy Code.

42.     Prior to the Petition Date, Brown Edwards received a retainer of $10,000 (the "**Brown Edwards Retainer**").  The Retainer was applied to invoices for services rendered in contemplation of this case and reimbursement of related costs and expenses incurred by Brown Edwards on behalf of UHWV.  After payment for pre-petition services, the balance of the Retainer held by Brown Edwards is $0.00.  The Retainer shall serve as security for the payment of unpaid post-petition fees and expenses owed to Brown Edwards by the Debtor, as may be further ordered by the Court in accordance with the Application.

### Emergency Motion for Order Authorizing Maintenance of Existing Cash Management System, Opening of New DIP Accounts as Needed, and Continuation of Intercompany Transactions

43.     Pursuant to the *Debtor's* Motion *For Entry Of Interim And Final Orders Authorizing The Debtor To (A) Maintain Existing Bank Accounts And Continue Use Of Cash Management System, (B) Open New Debtor In Possession Accounts As Needed, And (C) Continue To Perform Intercompany Transactions,* the Debtor seeks entry of interim and final

orders authorizing the Debtor to: (a) maintain in the ordinary course of business its existing Cash

Management System, (b) open new debtor-in-possession account(s) in its sole discretion, and (c)

continue to perform intercompany transactions.

44.    UHI operates a sophisticated and complex centralized cash management system

(the "**Cash Management System**"), and provides accounting and cash management services to

the Debtor under its Rental Company Contract.  All gross cash collections and payments are

recorded directly to the Debtor's general ledger and UHI uses an inter-company account as a

substitute for the cash account.  In other words, the net activity of the inter-company account

between UHI and the Debtor reflects either the Debtor's cash position or, if the net activity

results in a negative cash position, UHWV's payable to UHI.

45.    Cash Receipts:  More than 90% of all gross cash collections are received through

credit card charges from customers at point-of-sale equipment rental locations in West Virginia

operated by the Debtor's employees, equipment rental locations operated by independent dealers

in the Debtor's territory ("**Dealer**") and self-storage locations operated by the Debtor's

employees in West Virginia.

46.    All of the Debtor's locations utilize the centralized UHI credit card merchant

processing network maintained and operated by JPMorgan Chase (the "**Chase Network**").  All

credit card charges reflecting the gross revenue for services are processed through the Chase

Network.

47.    UHI's centralized accounting and cash management systems tracks each customer

charge using network identifiers to record the gross cash collections onto the general ledger of

the Debtor and separately deposit the cash cleared through the Chase Network into UHI's cash

concentration account.  Effectively, there is no difference in the accounting for and tracking of

gross cash receipts of the Debtor utilizing the Chase Network versus a separate but similar network operated by the Debtor.

48.   <u>Cash Disbursements - Vendors</u>:  As part of UHI's centralized cash management services/system, UHI processes all payments and disbursements for the Debtor.

49.   Vendor payments related to the Debtor are paid by check, wire or ACH ("**Payments**") from the centralized accounts payable account at JPMorgan Chase owned by UHI. All Payments are made under the name of the Debtor (i.e. vendor checks state UHWV on the check) and paid in the ordinary course upon approval of UHWV management.

50.   Payments are recorded to the Debtor's general ledger at the time of payment.

51.   The centralized accounting and cash management system provides the Debtor with detailed expenditure tracking and accounts payable aging reports.

52.   Effectively, there is no difference in the accounting for and tracking of Payments of the Debtor utilizing the UHI cash management network/services versus a separate but similar network operated by the Debtor.

53.   <u>Cash Disbursements – Employee Payroll</u>:  As part of UHI's centralized cash management system/services, UHI processes all employee payroll and payment of related payroll deductions/benefits for the Debtor.

54.   Employee payroll funding related to the Debtor are paid to employees by direct deposit to employee bank accounts or via funding of employee debit cards though a third-party service called Money Network ("**Payroll**") from the centralized banking account at JPMorgan Chase owned by UHI.  Payroll is paid under the name of the Debtor, and is paid only at the request and upon approval of the Debtor's management.  Employees of the Debtor receive W-2s from the Debtor.

55.     Payroll is recorded to the Debtor's general ledger at the time of payment for the appropriate payroll period.

56.     The centralized accounting and cash management system provides the Debtor with detailed Payroll tracking and Payroll reports.

57.     Payroll deductions for 401k, HSA Accounts and other benefits are approved by the Debtor's management, and payments are made to third parties upon their request.

58.     Changes to the current Cash Management System or Payroll System would require significant changes to both third-party provider interfaces (Chase Network, Payroll, Vendors) and internal tracking and reporting which could result in unnecessary expense and delays in processing and accounting for transactions for the Debtor.

59.     As detailed above, the Cash Management System operationally tracks all cash activity of the Debtor on a detailed transactional basis and provides 100% transparency no differently than if the Debtor operated its own cash management and payroll system.  The Cash Management System is fully integrated into UHI's SAP accounting systems creating a dependable and sophisticated financial reporting system.  There is no benefit or need to alter this system and the cost and time required to attempt such changes are significant.

60.     The Debtor will open at least one post-position debtor-in-possession account for the purpose of depositing and maintaining all cash received by the Debtor (outside of the UHI Cash Management System) on and after the Petition Date.  Additionally, no less than monthly, to the extent that a positive balance exists in the Debtor's UHI managed general ledger account, the balance will be deposited into the DIP account.

**Emergency Motion for Order Authorizing Payment of Pre-petition Employee
Obligations in the Ordinary Course of Business**

61.     The Debtor employs 107 employees as of the Petition Date, the vast majority of

which are hourly, and in some cases, part-time hourly workers.  The Debtor's employees are paid bi-weekly in arrears.  The Debtor's last full payroll period was May 31, 2021 – June 13, 2021, and was funded before the Debtor filed its chapter 11 petition.  However, wages, employee benefits, expense reimbursements, related payroll tax obligations, and other employee obligations (collectively, the "**Employee Obligations**") for a two-day period (June 14, 2021 - June 15, 2021) accrued pre-petition, and remained unpaid as of the Petition Date.  For each of the Debtor's employees the amount of prepetition Employee Obligations owed is less than the priority wage amount ($13,650) under 11 U.S.C. § 507(a)(4).

62.     All of the Debtor's employees are W-2 employees who work in the state of West Virginia.

63.     The Debtor employs both hourly and salaried, and both full-time and part-time workers depending on their respective jobs and roles.

64.     All employees are paid 26 times per year with each two-week pay-period starting on a Monday and ending on the Sunday, 14 days later.

65.     Pursuant to the Rental Company Contract, UHI provides administrative payroll and employee benefits services to the Debtor (collectively, "**Payroll Services**").

66.     Hourly timecards and other payroll data are reviewed and approved by the Debtor's managers on the Monday immediately after the end of a pay-period.  Once approved, the payroll data is submitted to UHI for processing.

67.     Upon receipt of approved payroll files from the Debtor, UHI processes the Debtor's payroll, calculates and adjust for all withholdings and taxes, deductions for employee portion of benefits and any other payroll deduction directed by the employee.

68.     UHI, though the corporate cash management systems:

a.      Funds all employee net pay either to an employee bank account via direct deposit or to a debit card on the Money Network third-party network such that each employee receives its net pay on the Thursday after the end of the two-week pay period. UHI then records such amounts in the Debtor's general ledger;

b.      Remits all federal, state and local payroll taxes to the proper taxing authority together with the appropriate filings on behalf of the Debtor and records such activity in the Debtor's general ledger;

c.      Processes and funds all benefits (medical, dental, HSA, 401k and other payroll deductions and benefits) to the appropriate vendor or employee designated account, and then records such activity in the Debtor's general ledger;

d.      Manages worker's compensation obligations and insurance for the Debtor's employees; and

e.      Processes payroll deductions for 401k, HSA Accounts and other benefits that are approved by the Debtor's management and payments made to third parties upon request.

69.     While the Debtor does not believe that there are any outstanding payments related to unpaid pre-petition benefits, the Debtor requests that all contributions and premiums for pre-petition benefits continue to be honored and paid in the ordinary course.  Similarly, the Debtor does not believe that there are any pre-petition checks or direct deposits outstanding, but if and to the extent any remain, the Debtor seeks authority for any and all applicable banking institutions (the "**Banks**") to honor those checks and deposits.

a.      For example, there may be some withholdings from employee checks and the related employer contributions for benefits that will need to be remitted to the

respective providers, including those contributions sent to providers for Health Savings Account, Special Savings Account, and similar employee benefits.

b.      For Flexible Spending Account, Dependent Care Reimbursement Account, Disability (STD & LTD), Voluntary Life insurance, Health Insurance, Dental, Vision, Critical Illness, Group Accident, Metlaw, and Lifelock contributions are deducted bi-weekly with premiums being paid one month in arrears (May is paid in June, June is paid in July, etc.), the Debtor requests authorization so that any pre-petition amounts continue to be paid to the appropriate provider in the ordinary course.

c.      For company paid life insurance premiums that are paid one month in arrears (May is paid in June, June is paid in July, etc.), the Debtor requests authorization so that any pre-petition amounts continue to be paid to the appropriate provider in the ordinary course.

70.     The current pay-period in which these pre-petition wages and benefits have accrued will end on June 27, 2021 for payment to employees on July 1, 2021.

71.     Accordingly, the Debtor seeks interim and final orders: (a) authorizing the Debtor, in accordance with its existing policies to: (i) pay all prepetition wages, salaries, and other compensation owed to the Debtor's employees, (ii) reimburse prepetition business expenses incurred by the Debtor's employees, (iii) pay prepetition employee tax and other withholdings to third-parties, (iv) maintain and make contributions to prepetition health and other employee benefit programs, (v) honor prepetition workers' compensation obligations and other insurance premiums; and (b) authorizing and directing Banks to honor and process check and electronic transfer requests related to the foregoing.

72.     The Debtor's employees rely on timely receipt of their Employee Obligations in

the ordinary course of business to pay for their immediate living expenses. Accordingly, the Debtor is requesting an order from the Court, among other things, authorizing the Debtor to pay the prepetition Employee Obligations in the ordinary course of business post-petition (up to the maximum priority amount of $13,650).

73.     The total amount of prepetition Employee Obligations owed to all employees is approximately $25,267.00. The Debtor anticipates having sufficient cash on hand to pay the Employee Obligations in full in the ordinary course of business. Attached hereto as Exhibit A is a 26-week cash flow prepared by the Debtor with the assistance of UHI.

### Emergency Motion To Honor Dealer Contracts and Customer Rental And Self-Storage Contracts In The Ordinary Course Of Business

74.     In the ordinary course of its business and as part of its daily operations, the Debtor enters into the following contracts with its equipment rental and self-storage customers (collectively, the "**Customer Contracts**"):

    a.  *U-Haul Equipment Contract* for the lease of moving vans or other equipment (the "**Customer Equipment Contract**"); and

    b.  *U-Haul Self Storage Agreement* for the lease of individual self-storage units at the Debtor's self-storage facilities (the "**Customer Self Storage Contract**").

75.     The Customer Contracts are standard form contracts executed by and between the Debtor and individual customers.

76.     Pursuant to the terms of the Customer Equipment Contract, the Debtor rents to customers moving vans and other equipment at a market rate of rent in addition to certain other rental fees and charges, including among other potential charges, a mileage charge, an environment fee, an after-hours equipment return convenience fee, a safe move fee, and fuel convenience fee.

77.     As part of the Customer Equipment Rental Contract, in the ordinary course of its

business, the Debtor also provides each customer with the minimum limits of insurance protection required under applicable state law in connection with the customer's use of the equipment or moving van rental.

78.    Under the terms of the Customer Equipment Contract, the customer is also required to pay an advance rental deposit (the "**Rental Deposit**").  The Rental Deposit is collected by the Debtor at the time that each Customer Equipment Contract is signed and held by the Debtor pending the return of the rental equipment or moving van by the customer.  For One-way rental, the Rental Deposit is charged at dispatch and then anything above the initial charge is collected at the time and location of the return. For In-Town rentals, the rental amount is charged upon return.  If, when the moving van or equipment is returned by the customer, the advance Rental Deposit collected by the Debtor exceeds the actual rental fees and costs incurred by that particular customer under the Customer Equipment Contract, the Debtor refunds to that Customer all such excess Rental Deposit amounts collected by the Debtor.

79.    Pursuant to the terms of the Customer Self Storage Contract, the Debtor rents to individual customers the use of self-storage rooms at a monthly market rate of rent.  The term of each Customer Self Storage Contract is month to month.

80.    As part of the Customer Self Storage Contract, the Debtor also offers each customer an option to purchase certain low-cost insurance coverage.  If a customer opts to purchase such coverage, the Debtor charges an additional monthly fee for such coverage under the terms of the Customer Self Storage Contract.

81.    In the ordinary course of its business and as part of its daily operations, the Debtor contracts (collectively, the "**Dealer Contracts**") with approximately 123 independent dealers (collectively, the "**Dealers**" and individually, each a "**Dealer**") who rent U-Haul equipment at

various equipment rental locations as a supplement to the Debtor's primary business.

82.     The Dealer Contracts are individual contracts entered into by and between the Debtor, the debtor on the one hand, and the individual Dealer on the other, and provide generally, among other terms, that (i) the Debtor will consign to the Dealer various equipment, U-Box containers, and/or trailers managed by the Debtor; (ii) the Dealer will conduct that portion of its business as a U-Haul dealer, for the Debtor at the Dealer's location; (iii) the Dealers are paid a specific commission at the contract rate based on the gross revenue from the rental of the consigned equipment; and (iv) the Debtor also provides the Dealer with, among other things, an online network of management and point of sale tools including certain software licenses and related documents, supplies and training and instructions for the operation of the U-Haul dealership and equipment rental and/or in some cases additional signage at an additional fee.

83.     The Debtor respectfully requests entry of an Interim Order and Final Order authorizing, but not directing, the Debtor to maintain and administer, in the ordinary course of business and consistent with past practice, customer and dealer-related contracts and practices, including the Customer Contracts and Dealer Contracts, and to pay and otherwise honor its obligations to the customers and Dealers thereunder, whether arising prior to or after the Petition Date, as necessary and appropriate in the Debtor's business judgment.  Although they arise in the ordinary course of business, out of an abundance of caution the Debtor requests the authority to continue honoring its obligations to customers and Dealers on a go forward basis.

### Emergency Motion To Continue Utility Service And Determine Adequate Assurance Of Future Payments

84.     The Debtor respectfully requests that the Court enter an order providing that the Debtor's utility providers (each a "**Utility Company**" and collectively the "**Utility Companies**")

are prohibited from altering, refusing or discontinuing services to, or discriminating against, the

Debtor on the basis of the commencement of this bankruptcy case, on account of any unpaid

invoice for service provided prior to the Petition Date, or for lack of adequate assurance of

payment.

85.    The Debtor's use of utility services is not nominal and likewise is not so

significant to justify a robust motion practice for determining adequate assurance of payment.

The Debtor seeks approval of a process that will fairly and equitably address the concerns of the

Utility Companies while averting potentially costly disruptions of operations and preserving

judicial economy.

86.    Section 366 of the Bankruptcy Code governs the rights and obligations of the

Utility Companies as providers of utility services to the Debtor.  Pursuant to Section 366(c)(2) of

the Bankruptcy Code, with respect to cases filed under chapter 11, such Utility Companies "may

alter, refuse, or discontinue utility service, if, within twenty (20) days of the filing of the Order

for Relief, the utility does not receive from the debtor or the trustee adequate assurance of

payment for utility services that is satisfactory to the utility."

87.    In connection with the operation of its business, the Debtor currently utilizes

electricity, water, sewer, telephone, and similar services (the "**Utility Services**").  A list of the

names of the Utility Companies for which adequate assurance of payment is proposed is attached

to the Debtor's utility motion as Exhibit A.

88.    The Debtor proposes to provide each of the Utility Companies that request a

deposit in writing within thirty (30) days of the issuance of an Order on this Motion, as adequate

assurance of payment, a cash deposit in an amount equal to one-half of the previous month's bill

for utility services provided by each respective Utility Company prior to the Petition Date (the

"**Adequate Assurance Deposit**").  Requests for an Adequate Assurance Deposit shall be served on the Debtor's proposed counsel, Flaherty Sensabaugh Bonasso, PLLC, Attn:  James W. Lane, Jr., P.O. Box 3843, Charleston, WV 25338, (telephone) 304.205.6373, (email) jlane@flahertylegal.com.  The Debtor submits that payment of the Adequate Assurance Deposit upon written request constitutes adequate assurance of payment under section 366 of the Bankruptcy Code.

89.     Because uninterrupted utility service is essential to the Debtor's ability to operate and maintain its operations, the Debtor requests that the Court grant the relief requested above immediately on an interim basis for all Utility Companies and on a final basis as to every Utility Company that does not timely file and serve an Objection.  Debtor requests that any Objection be resolved by a separate order of the Court.

90.     Finally, the Debtor requests that the order provide that any Utility Company that does not timely request in writing additional adequate assurance of payment pursuant to the above procedures to be deemed to have been provided adequate assurance of payment under section 366 of the Bankruptcy Code.

91.     Debtor submits that the Adequate Assurance Deposit – i.e., a cash deposit equal to one-half of the previous month's prepetition utility bill – along with the Procedures for Additional Assurance constitute adequate assurance of payment within the meaning of section 366.  The Adequate Assurance Deposit and Procedures for Additional Assurance ensure that Utility Companies are either provided with an acceptable cash deposit or, if the proposed deposit is not acceptable to the Utility Company, have the ability to request that the Court

**Motion To Establish A Claims Bar Date And Notice Thereof**

92.     The Debtor seeks entry of an order, pursuant to sections 105, 502(b)(9) and

503(b)(9) of title 11 of the United States Code, Rules 2002 and 3003(c) of the federal Rules of Bankruptcy Procedure (and the Local Rules of Bankruptcy Procedure for the Southern District of West Virginia), (a) establishing certain Bar Dates (as defined below) for filing proofs of claim in this chapter 11 case; (b) approving the form and manner of notice of the Bar Dates; (c) approving the Proof of Claim form (as defined herein); and (d) granting related relief.

93.     Pursuant to 11 U.S.C. Section 105, the Debtor respectfully requests that the parties to the *Ferrell* litigation be permitted and directed to file two class claims (the "**Class Claims**") in lieu of requiring notice and service upon each individual class member.  The cost of preparing, providing notice, and administering a claims process with each individual class member would be prohibitive in this Case, where there are 323,746 purported class members.

94.     While the Debtor disputes any liability for the claims raised in the *Ferrell* litigation, and further disputes the class certification that occurred pre-petition, in the interest of efficiency and economy the Debtor is proposing a Class Claims process to alleviate the burden on both the estate and creditors in this Case.

95.     The proposed Notice and Proof of Claim form would be delivered to counsel for the named Plaintiffs in the *Ferrell* litigation, who would be responsible for filing two separate Class Claims based on the two pre-petition classes certified by the state court.

My statements made herein are true and correct.  If called to testify in this matter, I can and will testify competently to the facts stated herein.

DATED:  June _____, 2021

_____
Charles Hertzler
Director/Responsible Person
U-Haul Co. of West Virginia